**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
:
JILL MARY BRAKER ,                                    :
                                                      :
                                    Plaintiff,        :          Civil Action No. 16-0170-BRM
                                                      :
                    v.                                :
                                                      :
COMMISSIONER OF SOCIAL                                 :
SECURITY,                                             :                    **OPINION**
                                                      :
                                    Defendant.        :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is the appeal by Jill Mary Braker ("Plaintiff") of the final decision of the

Acting Commissioner of Social Security, Carolyn W. Covlin (the "Commissioner"), denying

Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). Plaintiff contends

the decision of the Administrative Law Judge ("ALJ") is erroneous and not supported by

substantial evidence because the ALJ (1) failed to properly evaluate the medical evidence, (2)

failed to properly evaluate Plaintiff's credibility, and (3) improperly relied on testimony of the

vocational expert that was inconsistent with the Dictionary of Occupational Titles (the "DOT").

After reviewing the Administrative Record, the Court finds the ALJ failed to consider and

explain her reasons for discounting all of the pertinent evidence before her in making her

determination of Plaintiff's residual functional capacity ("RFC"). Accordingly, this case is

**REMANDED** for further administrative proceedings consistent with this Opinion.

## I. PROCEDURAL HISTORY

On May 14, 2012, Plaintiff filed an application for disability insurance benefits ("DIB"), under Title II of the Act[1] alleging disability beginning March 7, 2010 due to back pain, an injury to her right shoulder, depression, anxiety, and breathing problems. (*See* Transcript ("Tr.") at 135-36, 147.) Plaintiff's DIB application was initially denied on September 25, 2012. (Tr. 89-93.) Reconsideration of Plaintiff's DIB application was denied on February 21, 2013. (Tr. 95-97.) On April 26, 2013, pursuant to 20 C.F.R. § 404.929, *et seq.*, Plaintiff filed a written request for a hearing before an ALJ. (Tr. 98-99.) On August 12, 2014, a hearing was held before ALJ Marguerite Toland in Pennsauken, New Jersey. (Tr. 28-57.) Plaintiff, who was represented by counsel, Robert Ryan, Esq., appeared and testified at the hearing. (*Id.*) In a decision dated August 29, 2014, ALJ Toland determined Plaintiff was not disabled from March 7, 2010 through the date of the ALJ's decision. (Tr. 8-27.) Plaintiff requested the Appeals Council review this decision, (Tr. 7), which request the Appeals Council denied Plaintiff's on November 6, 2015. (Tr. 1-6.) Plaintiff then filed this civil action seeking judicial review of the ALJ's decision.

## II. FACTUAL BACKGROUND

Plaintiff was born on April 29, 1964, and was 45 years old at the alleged onset of her disability. (Tr. 58.) Plaintiff has a ninth grade education. (Tr. 148.) She previously worked for nine (9) years as a stocker at a ShopRite supermarket, until she was terminated on March 7, 2010. (*Id.*) There is conflicting evidence in the record as to whether Plaintiff was fired by ShopRite because she had not been meeting performance standards, or whether she was simply laid off. (*See* Tr. 37-38, 163, 340.) For the next two (2) years after her termination, Plaintiff collected unemployment

---

[1] Title II appears in the United States Code as §§ 401-433, subchapter II, chapter 7, Title 42.

benefits and continued to look for work. (Tr. 34.) Based on Plaintiff's earnings records, she acquired sufficient quarters of coverage to remain insured through December 31, 2015. (Tr. 11, 144.)

Plaintiff's alleged disability results from the following impairments: back pain related to a lumbar disorder, pain and weakness in her right shoulder, major depressive disorder, generalized anxiety disorder with panic attacks, and breathing problems stemming from asthma. (Tr. 65.) Plaintiff also has a long history of smoking. (Tr. 41-42.) Plaintiff has been prescribed multiple medications to treat her conditions including: oxycodone, morphine sulfate, and Roxicodone for pain; diazepam and Valium for muscle spasms; Ventolin for asthma; and Prozac for depression. (Tr. 39, 50, 204, 211, 215, 290, 292-93, 297, 302, 308, 338-39.)

Plaintiff initially reported on her May 18, 2012 Function Report that she lives in a mobile home with her husband and dog, and performs daily household chores such as cooking, cleaning, laundry, and caring for the dog, as her pain allows. (Tr. 157-59.) Plaintiff's husband has emphysema, does not work, and stays home with Plaintiff during the day. (Tr. 35.) Plaintiff reported she is able to drive and go out alone, shops weekly for food and household supplies, and attends church. (Tr. 159-6.) She reported that she takes care of the finances with her husband. (Tr. 160.) The only hobby she listed on the report was "watching T.V." (*Id.*) Plaintiff's daughter, Shelly Braker, stated in a Third-Party Function Report, dated May 20, 2012, that Plaintiff enjoys going to church and performs housework when she is able, but that she takes longer to complete these tasks and sometimes needs help from her adult children. (Tr. 165-72.)

Later, on August 6, 2012 and September 10, 2012, Plaintiff reported to consultative examiners that her adult daughter helps with housekeeping, shopping, laundry and cooking. (Tr. 327, 340.) She told the consultative examiner at the September 10, 2012 examination that she has

3

a hobby of crocheting. (Tr. 340.) At the hearing on August 12, 2014, Plaintiff testified that during a typical day she sits with her dog and "[doesn't] do much at all." (Tr. 45.) Plaintiff stated that she "never really liked TV" and she stopped crocheting two (2) to three (3) years ago "because of [her] fingers." (Tr. 45-46.) At the hearing, Plaintiff denied being able to go out alone and denied engaging in other social activities, such as church. (Tr. 46.)

### A.  Review of Medical Evidence

#### 1.  Alex Langman, M.D. – Treating Physician

On February 20, 2006, Plaintiff underwent a CT scan of her abdomen and pelvis to investigate a clinical indication of lower back pain. (Tr. 246.) According to Dr. Alex Langman, the test results revealed multiple nodules in Plaintiff's lungs. (Tr. 247.)

#### 2.  Roy Fertakos, M.D. – Treating Physician

On March 2, 2006, Plaintiff underwent a CT scan of her chest to investigate the pulmonary nodules previously noted on Plaintiff's abdominal CT scan. (Tr. 256.) The test results confirmed the existence of approximately ten (10) pulmonary modules in Plaintiff's lungs. (*Id.*) According to Dr. Roy Fertakos, the etiology of the nodules was "uncertain and include both inflammatory and neoplastic causes." (*Id.*)

#### 3.  Janet Spector, M.D. – Treating Physician

On June 18, 2007, Plaintiff underwent a CT scan of her chest to investigate a clinical indication of chest pain. (Tr. 254.) According to Dr. Janet Spector, the test results revealed scattered small pulmonary nodules in Plaintiff's lungs. (*Id.*) Dr. Spector opined that these nodules were "low index of suspicion" and recommended follow-up in six (6) and 12 months to document stability. (*Id.*)

### 4.  Bharat Patel, M.D. – Treating Physician

On March 8, 2011, Plaintiff underwent an MRI of the lumbar spine to investigate a clinical indication of chronic lower back pain. (Tr. 286-287.)  Dr. Bharat Patel reviewed the test results and diagnosed Plaintiff with varying degrees (from mild to moderate) of diffuse posterior disc bulges at multiple levels. (*Id.*) He did not observe any stenosis. (*Id.*)

### 5.  Roger Lalleman, M.D. – Treating Physician

Between May 31, 2011 and May 2, 2012, Plaintiff met with Dr. Roger Lalleman on a monthly basis to treat, among other complaints, her chronic back and neck pain. (Tr. 287-322.) Plaintiff reported to Dr. Lalleman that she was experiencing chronic back and neck pain, leg and arm pain, tingling in her neck, muscle stiffness, and difficulty sleeping. (*Id.*) Plaintiff also complained that damp weather caused her pain to worsen. (Tr. 307.) Dr. Lalleman's examinations of Plaintiff revealed tenderness in her back and neck, decreased extension and lateral bending, and intermittently positive and negative bilaterally straight leg tests. (Tr. 287-322.) After examining Plaintiff and reviewing her MRI records, Dr. Lalleman diagnosed Plaintiff with lumbar degenerative joint disease, cervical degenerative joint disease, lumbar radiculitis, depression, anxiety, vertigo, myalgia, chronic pain syndrome, and neuritis. (*Id.*) He prescribed Roxicodone and morphine sulfate to treat Plaintiff's chronic pain, Valium to treat her muscle spasms, and Symbyax and Abilify to treat her depression. (*Id.*) He also recommended various non-medication treatments for Plaintiff's back pain, including: restriction of activity for three (3) to six (6) weeks, 20-30 minutes of exercise three (3) times a week, weight reduction, heat/ice pain management, and posture and body mechanics training. (Tr. 293, 302.) Dr. Lalleman additionally prescribed a Ventolin inhaler to treat Plaintiff's pulmonary symptoms. (Tr. 302.)

On May 17, 2012, at the request of the State of New Jersey Department of Labor and Workforce Development, Dr. Lalleman filled out a General Medical Report regarding Plaintiff's medical conditions. (Tr. 323.) In his report, Dr. Lalleman indicated that Plaintiff had a history of upper and lower back pain. (Tr. 324.) He further reported that his examinations of Plaintiff revealed back tenderness, as well as difficulty bending and lifting her arms. (*Id.*) He diagnosed Plaintiff with lumbar spinal stenosis (diagnosis code 724.4), thoracic or lumbosacral neuritis or radiculitis (diagnosis code 724.4), and cervicalgia (diagnosis code 723.10). (*Id.*) Dr. Lalleman reported that Plaintiff was being treated with home exercise and was experiencing pain levels of 7/10. (Tr. 325.) Based on his findings, Dr. Lalleman opined that Plaintiff is limited to lifting up to five (5) pounds, standing and walking up to only two (2) hours per day, sitting less than six (6) hours per day, and generally limited in pushing and pulling. (Tr. 323-326.)

### 6.   Francky Merlin, M.D. – Examining Physician

On August 6, 2012, Plaintiff attended a consultative exam with Dr. Francky Merlin to assess the scope of her impairments. (Tr. 327-37.) Dr. Merlin noted Plaintiff has a history of high blood pressure, lower back pain, and asthma. (Tr. 327.) Plaintiff reported to Dr. Merlin that she has pain on a daily basis that is worsened by bending, lifting and sitting, and that she was currently taking morphine, Roxicodone, diclofenac, and Valium. (*Id.*) Plaintiff also reported that one (1) month prior she experienced an asthma attack caused by exertion, which lasted approximately 15 minutes, and was relieved by the administration of ProAir. (*Id.*) Plaintiff stated she is able to walk 50 feet and can take care of her personal hygiene, but requires her daughter's help with household chores. (*Id.*) Dr. Merlin observed that Plaintiff was anxious. (*Id.*)

Dr. Merlin examined Plaintiff and found she had no difficulty getting up from a sitting position or getting on and off the examining table, did not have impaired grasping strength of

manipulative functions, could squat and walk on her heels and toes, did not have impaired range of motion, and had normal station and gait. (Tr. 328.) Dr. Merlin observed tenderness in Plaintiff's neck, shoulder, and lumbar region, but no paravertebral hypertonicity. (*Id.*) Plaintiff's blood pressure was measured at 150/90. (*Id.*) A pulmonary function test revealed Plaintiff has moderate obstructive airways. (Tr. 329.) Dr. Merlin ultimately diagnosed Plaintiff with hypertension, lower back pain, and asthma. (*Id.*) Plaintiff refused to submit to blood tests or x-rays. (*Id.*)

### 7. Zulfiqar Rajput, M.D. – Examining Psychiatrist

On September 10, 2012, Plaintiff attended a consultative psychiatric exam with Dr. Zulfiqar Rajput to assess the scope of her impairments. (Tr. 338-40.) Plaintiff reported to Dr. Rajput that she: has been intermittently depressed for the last three (3) years since she stopped working; has no motivation or desire to do anything; has crying spells and poor sleep; feels anxious, nervous, worried shaky, jittery, and dizzy; experiences panic attacks at least four (4) times a week; has mood swings; and suffers from overwhelming pain. (Tr. 338.) Plaintiff denied poor appetite, feeling hopeless or helpless, suicidal or homicidal ideation, and manic episodes. (*Id.*) Plaintiff also denied drinking alcohol or using illegal drugs, but admitted to smoking five (5) cigarettes per day. (*Id.*) Plaintiff reported a medical history of back pain, a dislocated disc, arthritis of the back, left leg pain, and asthma. (Tr. 339.) Dr. Rajput recorded that Plaintiff was currently taking Prozac, Valium, phentermine, morphine, oxycodone, Advair, and albuterol. (*Id.*)

Plaintiff reported she completed grade school through the ninth grade and also attended cosmetology school. (*Id.*) Plaintiff told Dr. Rajput she previously worked cleaning houses and then worked at ShopRite for eight (8) years until 2009. (*Id.*) She reported she was currently prevented from working by her pain and depression. (*Id.*) According to Plaintiff, her mother also suffered from depression and her brother had bipolar disorder. (*Id.*) Plaintiff told Dr. Rajput that she shares

7

most of her household chores with her daughter, including housekeeping, laundry, and cooking. (Tr. 340.) Plaintiff stated that she can drive, she goes out shopping with her daughter, she has a few friends, she takes care of the finances together with her husband, and she plays with her dogs for fun. (*Id.*) Plaintiff reported that her disabilities affected her daily living by causing her to "sometimes take longer to do things." (*Id.*)

Dr. Rajput performed a mental status examination of Plaintiff and observed that Plaintiff was unable to do serial sevens or spell "table" backwards, and was only able to recall one (1) thing out of three (3) after five (5) minutes. (Tr. 339.) Plaintiff's mental status on examination was otherwise normal. (*Id.*) Dr. Rajput ultimately diagnosed Plaintiff with major depressive disorder, recurrent severe, generalized anxiety disorder with panic attacks, chronic pain, and neck and back pain. (Tr. 340.) Dr. Rajput assigned Plaintiff a global assessment of functioning ("GAF") score of 50, which indicates serious symptoms or serious impairment in social, occupational, or school functioning. (*Id.*) He opined that Plaintiff's long-term prognosis is guarded due to depression, anxiety, and physical problems. (*Id.*) Dr. Rajput concluded that Plaintiff needs to see a psychiatrist, therapist, medical doctor, pain management doctor, and pulmonary specialist doctor. (*Id.*)

### 8.   Malini Rao, M.D. – Treating Physician

On October 24, 2012, Plaintiff met with Dr. Malini Rao to treat her chronic lower back pain. (Tr. 348.) Plaintiff reported to Dr. Rao that she was experiencing chronic back and leg pain, as well as tingling in her legs. (*Id.*) Plaintiff explained that her pain improved with rest, heat, and massage. (*Id.*) Dr. Rao prescribed Roxicodone and morphine to treat Plaintiff's chronic pain and Valium to treat her muscle spasms. (*Id.*) She also recommended Plaintiff continue to practice physical therapy at home and apply moist heat to treat her pain. (*Id.*)

### 9.   Amanda Yesvetz, P.A. – Treating Physician's Assistant

Between November 19, 2012 and March 11, 2013, Plaintiff met with Physician's Assistant Amada Yesvetz on a monthly basis to treat, among other complaints, her chronic back, neck, and shoulder pain. (Tr. 343-37.) Plaintiff reported to Ms. Yesvetz that she had previously tried to treat her chronic pain with physical therapy, chiropractic, and injections, but none of these treatments were effective. (Tr. 344.) Ms. Yesvetz's examined Plaintiff and recorded that she was experiencing "tenderness and painful range of motion." (Tr. 343-37.) After examining Plaintiff, Ms. Yesvetz diagnosed Plaintiff with degeneration of the cervicothoracic intervertebral disc, degeneration of the lumbar intervertebral disc, cervicalgia/cervical disc disease, lumbago/lumbar disc disease, and bilateral shoulder pain. (*Id.*) She prescribed Roxicodone and MS Contin to treat Plaintiff's chronic pain and Valium to treat her muscle spasms. (*Id.*)

On January 14, 2013, Ms. Yesvetz filled out a State of New Jersey Division of Family Development Examination Report regarding her treatment of Plaintiff. (Tr. 341-42.) She diagnosed Plaintiff with cervical and lumbar disc disease, anxiety, depression, and asthma, beginning in 2010. (*Id.*) Ms. Yesvetz opined that Plaintiff is permanently unable to work full time, bend, lift more than 20 pounds, or sit/stand/walk for a prolonged period. (*Id.*) Ms. Yesvetz further opined that Plaintiff is a suitable candidate for social security income benefits. (*Id.*)

### 10. Dmitri Petrychenko, M.D. – Treating Physician

Between May 2, 2013 and October 8, 2013, Plaintiff met with Dr. Dimitri Petrychenko on a monthly basis to treat, among other complaints, her back pain. (Tr. 349-69.) Plaintiff reported to Dr. Petrychenko that for two (2) years she had been experiencing neck and back pain, back stiffness, radicular pain in her arms and legs, weakness in her arms and legs, and spasms in her toes. (*Id.*) Plaintiff stated her pain was exacerbated by walking, standing for a long time, back and

hip flexion/extension, hip rotation, shoulder movement, and other movements. (*Id.*) Plaintiff denied alcohol, tobacco, and illegal drug use. (*Id.*) Dr. Petrychenko's examinations of Plaintiff revealed decreased lumbar flexion and extension with pain, decreased left and right side bend with pain, decreased left rotation with pain, and decreased right rotation without pain. (*Id.*) After examining Plaintiff, Dr. Petrychenko diagnosed her with lumbar radiculopathy and cervical radiculopathy. (*Id.*) He prescribed oxycodone and morphine sulfate to treat Plaintiff's chronic pain and Valium to treat her muscle spasms. (*Id.*)

### 11. Raul Valcarcel, M.D. – Treating Physician

Between November 5, 2013 and July 15, 2014, Plaintiff was treated by Dr. Raul Valcarcel for lower back pain and paraspinal tenderness. (Tr. 370-89.) Plaintiff reported to Dr. Valcarcel that she had been suffering from back pain and leg pain for four (4) years. (Tr. 370-75.) Plaintiff stated her pain was aggravated by bending, standing, sitting for long hours, and travelling. (*Id.*) She also reported a medical history of hypertension and asthma. (*Id.*) Plaintiff claimed to consume alcohol and caffeine, as well as smoke cigarettes. (*Id.*) Dr. Valcarcel physically examined Plaintiff and found that she had no muscular weakness and a normal range of motion, but that she was exhibiting muscular tenderness and had a positive straight leg raise on the right side. (*Id.*)

Dr. Valcarcel ordered the following MRIs of Plaintiff's spine: (1) an MRI of the cervical spine, performed on February 3, 2014; (2) an MRI of the lumbar spine, performed on February 27, 2014; and (3) an MRI of the thoracic spine, performed on May 8, 2014. (Tr. 377-89.) The MRIs revealed (1) multilevel degenerative disc disease in the cervical spine, most pronounced at the level of C4-5 and C5-6, with left paracentral posterior disc protrusions/herniation, moderate spinal canal stenosis, and narrowing of the neural foramina; (2) mild degenerative disc disease in the thoracic spine with disc bulges; (3) and varying degrees of diffuse posterior disc bulges in the

lumbar spine at multiple levels, somewhat worse at the L4-5 and L3-4 levels, and minimal stenosis. (*Id.*) Dr. Valcarcel ultimately diagnosed Plaintiff with unspecified backache, cervicalgia, hypertension, and asthma. (Tr. 370-75.) He prescribed oxycodone and MS Contin for Plaintiff's pain, Valium for her muscle spasms, Dulera for her asthma, and Benicar for her blood pressure. (*Id.*)

### B. Review of Disability Determinations

#### 1. James Paolino, M.D. – Disability Determination

On September 18, 2012, state agency medical consultant Dr. James Paolino reviewed the evidence of disability submitted by Plaintiff and assessed Plaintiff's level of physical impairment. (Tr. 58-72.) Dr. Paolino determined Plaintiff suffers from the following severe impairments: spine disorders, dysfunction of major joints, asthma, anxiety disorders, and affective disorders. (Tr. 65-66.). He concluded Plaintiff's impairments limit her to only occasional lifting or carrying up to 20 pounds, frequent lifting and carrying up to ten (10) pounds, standing or walking up to three (3) hours, and sitting for up to six (6) hours in an eight (8)-hour workday. (Tr. 67.) He further determined Plaintiff could only occasionally climb ramps, stoop, and kneel; could never climb ladders, ropes, or scaffolds; could never crouch or crawl; and could frequently balance. (Tr. 67-68.) Regarding Plaintiff's manipulative limitations, Dr. Paolino found Plaintiff had reaching limitations on both sides in front, laterally, and overhead. (Tr. 68.) Dr. Paolino determined Plaintiff needed to avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity, as well as moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 69.) Dr. Paolino opined that, due to her impairments, Plaintiff is limited to sedentary work, but is not disabled. (Tr. 71.)

### 2.   Joan F. Joynson, M.D. – Disability Determination

On September 24, 2012, state agency medical psychologist Dr. Joan F. Joynson reviewed the evidence of disability submitted by Plaintiff and assessed Plaintiff's level of mental impairment. (Tr. 69-70.) Dr. Joynson concluded Plaintiff is moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 69-70.) Dr. Joynson opined that Plaintiff could sustain the necessary concentration, persistence, and pace for simple work. (*Id.*)

### 3.   Joseph Wieliczko, M.D. – Disability Determination

On January 31, 2013, state agency medical consultant Dr. Joseph Wieliczko reviewed the evidence of disability submitted by Plaintiff and reassessed Plaintiff's level of mental impairment. (Tr. 74-85.) He confirmed Dr. Joynson's findings on reconsideration. (*Id.*)

### 4.   Jyothsna Shastry, M.D. – Disability Determination

On February 19, 2013, state agency medical consultant Dr. Jyothsna Shastry reviewed the evidence of disability submitted by Plaintiff and reassessed Plaintiff's level of physical impairment. (Tr. 74-85.) She confirmed Dr. Paolino's findings on reconsideration. (*Id.*)

### C.  Review of Testimonial Record

### 1.   Plaintiff's Testimony

At the hearing before the ALJ on August 12, 2014, Plaintiff testified she had last worked on March 7, 2010. (Tr. 34.) Plaintiff confirmed her birth date was April 29, 1964, making her 50 years old as of the date of the hearing. (*Id.*) Plaintiff stated she resides in a mobile home with her husband, who has emphysema and does not work. (Tr. 34-35.) Plaintiff further stated she has adult

children who no longer live with her, but her daughter lives nearby. (Tr. 35, 47.) Regarding her level of education, Plaintiff testified she does not have a GED and she was classified as a special education student in grade school. (Tr. 36.) Plaintiff stated she had never received vocational training, except on-the-job training as a clerk at ShopRite, her most recent employer. (*Id.*) Plaintiff explained her job duties at ShopRite were to unload trucks and pallets, and stock shelves before the store opened. (Tr. 37.) She estimated the boxes she was required to lift for this job weighed approximately 50 pounds. (*Id.*) When asked what made her stop working at ShopRite in 2010, Plaintiff explained "they were starting to get rid of higher paid people, and [she] was declining on [her performance]." (*Id.*) When asked to clarify if she was laid off or fired, Plaintiff stated she was fired. (*Id.*)

Regarding her medical treatment, Plaintiff testified she was currently seeing an internist about once a month, but that she could not afford to see other doctors, because she does not have insurance. (Tr. 38-39.) Plaintiff confirmed she is currently taking oxycodone, morphine sulfate, diazepam, Dulera, and Benicar, and was previously treated for her back pain with epidural injections. (Tr. 39-40.) Plaintiff explained she also uses warm compresses and stretches to treat her pain, and plans to go to physical therapy when she gets insurance. (Tr. 44.) According to Plaintiff, she sometimes experiences side effects from her medications, including difficulty concentrating, sleepiness, and sleeplessness. (Tr. 39-40.) Although Plaintiff stated her medication is effective in treating her conditions, (Tr. 40), she later testified that, even with this treatment, she has pain "all over." (Tr. 43.) She stated she has burning in her skin, but her main problem is pain in her neck, right arm, and back. (*Id.*) According to Plaintiff, she is losing strength in her right arm, which causes her to drop things. (*Id.*) Plaintiff stated the pain in her neck travels down her right arm to her fingers. (Tr. 47.) She stated her pain level is a seven (7) out of ten (10) with medication,

13

but without medication, she would be in a lot of pain. (Tr. 43-44.) According to Plaintiff, she had initially chosen not to treat her back pain with surgery, although Dr. Lalleman had recommended it, because she was "holding out on insurance." (Tr. 40.) Plaintiff further explained that her doctors have since informed her that her back problems are so severe that, even with surgery, she will likely continue to experience back pain. (*Id.*) Plaintiff claimed to also experience shortness of breath and wheezing due to her asthma. (Tr. 40-41.) Plaintiff treats her asthma with hand-held inhalers, and does not have a nebulizer at home. (Tr. 41.) She admitted she still smokes, despite her breathing problems. (*Id.*) Plaintiff also testified that she suffers from depression and anxiety, which causes her to "shake inside." (Tr. 42.) According to Plaintiff, these shaking episodes occur when her routine changes or she gets frustrated when she can't do something. (*Id.*)

Plaintiff testified that her pain is aggravated by activity. (Tr. 44.) According to Plaintiff she can only sit comfortably for ten (10) to 15 minutes; can only stand comfortably for 15 minutes; can walk about two (2) blocks with taking breaks; and although she can lift a gallon of milk with her left arm, she has difficulty raising her arms. (Tr. 44-48.) Plaintiff testified she has trouble staying asleep because she has to keep moving throughout the night. (Tr. 48.) Plaintiff stated that, on a typical day, she doesn't do much at all. (Tr. 45.) When asked if she could perform household chores, Plaintiff answered she can occasionally cook something simple, is unable to vacuum, can sometimes do the laundry, can pay bills, and can go grocery shopping. (Tr. 45-46.) Plaintiff explained her daughter often helps her with household chores and shopping. (*Id.*) Plaintiff stated she is unable to hold a pen and write for a long time or wash and comb her hair, because her fingers cramp up. (Tr. 47.) She explained her daughter washers her hair for her. (*Id.*) She also testified that, although she has a driver's license, she does not drive while she is on her medication; instead her husband or daughter usually drives when she goes out. (Tr. 35.) When asked if she could go

out grocery shopping by herself, Plaintiff replied that it was very rare. (Tr. 46.) Plaintiff stated she

no longer visits friends and family or attends church or social groups. (*Id.*) When asked about her

hobbies, Plaintiff stated she used to enjoy crocheting, but stopped about two (2) or three (3) years

ago because of her fingers. (*Id.*) When asked how long Plaintiff has been suffering from these

conditions, Plaintiff answered three (3) years. (Tr. 49.)

## 2. Testimony of the Vocational Expert

At the August 12, 2014 hearing, vocational expert Marian Morracco testified Plaintiff's

past relevant work is classified as a warehouse worker (DOT 922.687-058), which has a specific

vocational preparation ("SVP") of 2, and is classified as unskilled labor at medium exertional level.

(Tr. 51.) The vocational expert opined, however, that Plaintiff's past job as she performed it should

be classified as a heavy exertional level, because Plaintiff was lifting up to 100 pounds. (Tr. 51-

52.)

The ALJ posed a hypothetical scenario to the vocational expert involving an individual

with Plaintiff's same age, education, and past work; who is limited to light work; can walk and

stand up to six (6) hours per day; can lift up to 20 pounds occasionally and ten (10) pounds

frequently; can walk or stand no more than one (1) hour at a time and then needs to sit or shift

positions for up to five (5) minutes every hour while remaining on a task; cannot climb ropes,

ladders, or scaffolds; can only occasionally climb ramps and stairs; requires low stress work,

meaning no fast production rate pace or strict production quotas; is limited to simple tasks; needs

to avoid concentrated exposure to dust, fumes, pulmonary irritants and temperature extremes; and

can only frequently handle. (Tr. 52.) When asked if such an individual could per perform Plaintiff's

past work, the vocational expert answered in the negative. (*Id.*) When asked if there were any other

jobs such an individual could perform, the vocational expert stated that such an individual could

perform the job of marker (DOT 209-587.034), which is SVP 2 and is classified as light exertional level; mail clerk (DOT 209.687-026), which is SVP 2 and is classified as light exertional level; and cashier II (DOT 211.462-010), which is SVP 2 and is classified as light exertional level. (Tr. 52-53.) The vocational expert stated these jobs could be performed by the same individual, even if she could stoop only occasionally. (Tr. 53.) The vocational expert also stated such an individual could be off task for no more than ten (10) percent of any given workday, in addition to normal breaks. (*Id*.) She opined if such an individual is off task from 11 to 15 percent, employment would be precluded. (*Id.*) The vocational expert stated that her testimony was consistent with the DOT, except the testimony related to the acceptable percent of time the individual could be off task and the sit/stand option at these jobs. (Tr. 53-54.) When asked if the individual would still be able to perform these jobs if she needed to be able to sit and stand at will, the vocational expert opined that it would erode the numbers of cashier II by half, but that she could still perform the jobs of marker and mail clerk. (Tr. 54.)

### D.  ALJ's Findings

The ALJ issued her opinion in this matter on August 29, 2014. (Tr. 8-23.) She determined Plaintiff met the insured status requirements of the Act, and would continue to meet them through December 31, 2015. (Tr. 11.) However, after reviewing the record, the ALJ found Plaintiff was not disabled within the meaning of the Act, from March 7, 2010 through the date of her decision. (*Id.*) In reaching this conclusion, the ALJ applied the standard five-step evaluation process to determine if Plaintiff satisfied her burden of establishing disability.[2] (Tr.11-23.)

At step one, the ALJ determined Plaintiff has not engaged in substantial gainful activity since March 7, 2010, the alleged disability onset date. (Tr. 13.)

---

[2] *See infra* Part III.

At step two, the ALJ determined Plaintiff has the following severe impairments: disorders of the lumbar and cervical spine, major depression, and generalized anxiety disorder with panic attacks. (*Id.*) The ALJ found, however, that Plaintiff's alleged asthma does not cause more than minimal limitation on her ability to perform work-related activities and is therefore non-severe. (*Id.*) The ALJ's determination was based on the following findings: (1) "there [is] no evidence of treatment for asthma," (2) "[c]onsultative examiner Dr. Merlin noted that pulmonary function testing revealed moderate obstructive airways," and (3) "[r]ecords show that Plaintiff smokes cigarettes." (*Id.*)

At step three, the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meet or medically equal the severity of any of the impairments listed in the Impairment List. (*Id.*) In coming to this conclusion, the ALJ specifically considered the criteria for Section 1.04 (disorders of the spine), Section 12.04 (affective disorders), and Section 12.06 (anxiety related disorders). (Tr. 13-16.)

The ALJ found Plaintiff does not meet the criteria for Section 1.04, because "there is no evidence of compromise of a nerve root or spinal cord, nerve root compression, spinal arachnoiditis, lumbar spinal stenosis, or ineffective ambulation in the medical record." (Tr. 14.) Additionally, the ALJ determined Plaintiff does not meet the criteria of Sections 12.04 or 12.06, because Plaintiff's activities of daily living are only mildly restricted, she has only mild difficulties in social functioning, she has only moderate difficulties with concentration, persistence, and pace, and she has experienced no episodes of decomposition. (*Id.*) In coming to this conclusion, the ALJ observed Plaintiff cooks and performs household chores as she is able, goes out alone, drives, goes to church, has a few friends, cares for and plays with her dog, shops in stores for groceries, and handles her personal finances. (*Id.*) Additionally, the ALJ noted Plaintiff has alleged difficulty

17

finishing tasks, because of pain, and difficulty concentrating, because of anxiety. (*Id.*) The ALJ explained her conclusions were supported by the psychiatric reviews of Dr. Joynson and Dr. Wieliczco, which the ALJ afforded great weight. (Tr. 14-15.)

At step four, the ALJ found Plaintiff has the RFC to perform light work, as defined in 20 CFR 404.1567(b), except that Plaintiff can walk and/or stand up to six (6) hours per day; needs to sit/stand at will during the day, while remaining on task; can only occasionally stoop; cannot climb ropes, ladders, or scaffolds; can only occasionally climb ramps and stairs; requires low stress work, defined as work that would not involve fast production rate pace or strict production quotas; is limited to performing only simple tasks; must avoid concentrated exposure to dust, fumes, pulmonary irritants, and temperature extremes; and can perform no more than frequent handling. (Tr. 16.) In determining Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the opinion evidence in the record. (*Id.*)

Based on this evidence, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] and [her daughter's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 17.) The ALJ observed several inconsistencies between Plaintiff's testimony at the hearing and evidence in the record. (*Id.*) The ALJ noted, "[a]lthough [Plaintiff] alleged she was fired from ShopRite because of her medical conditions, the record shows that [Plaintiff] was 'laid off', and in fact, she received unemployment compensation for two years." (Tr. 17.) Additionally, the ALJ found "recent treatment records show fairly benign physical examinations, which is not consistent with the strong narcotic pain medication being prescribed by the [Plaintiff's] primary care physician." (Tr. 17-18.) The ALJ further opined that the credibility

18

of Plaintiff's subjective complaints was undermined by the fact that there is no evidence Plaintiff sought treatment with an orthopedist's for her alleged back impairments after her second orthopedist's office closed in 2013. (Tr. 18.) Plaintiff's credibility was further undermined in the ALJ's estimation by her refusal to submit to the blood test and x-rays requested by Dr. Merlin. (Tr. 19.)

The ALJ additionally explained the medical record does not support Plaintiff's allegations of disability insofar as "the record contains evidence of long-term narcotic pain medication use, but physical examinations do not reveal significant positive findings." (Tr. 18.) In that regard, the ALJ opined that Dr. Lalleman, Dr. Merlin, Ms. Yesvetz, Dr. Petrychenko, and Dr. Valcarcel's medical records do not support claimant's allegations of disability. (Tr. 18-19.) The ALJ assigned little weight to Dr. Lalleman's assessment of Plaintiff's ability to lift, carry, stand, walk, or sit for prolonged periods, or push and pull, because these conclusions are not supported by his own treatment records. (Tr. 21.) The ALJ generally gave little weight to Ms. Yesvetz's assessment that Plaintiff cannot work because she cannot bend, lift more than 20 pounds, sit/stand/walk for prolonged periods, because (1) "physician's assistants are not acceptable medical sources" and (2) "Ms. Yesvetz failed to give specific limitation regarding sitting, standing, and walking." (*Id.*) However, the ALJ gave some weight to Ms. Yesvetz's assessment that Plaintiff could lift up to 20 pounds, because the ALJ found it to be consistent with the record. (*Id.*) The ALJ assigned great weight to the state agency findings by Dr. Paolino and Dr. Shastry as to Plaintiff's limited ability to lift, carry, and handle, because she found they were consistent with the record. (Tr. 20.) However, the ALJ assigned little weight to Dr. Paolino and Dr. Shastry's assessment of Plaintiff's ability to balance, crouch, crawl, stoop, kneel, reach, or stand/walk for prolonged periods of time, because the ALJ found they were not consistent with the record. (*Id.*) Additionally, the ALJ

assigned little weight to Dr. Paolino and Dr. Shastry's assessment of Plaintiff's environmental limitations because "the record shows that the claimant is a cigarette smoker . . . [and] [t]here is no evidence of asthma exacerbation or treatment since the alleged onset date." (*Id.*)

The ALJ also found that, although Plaintiff has alleged major depression and generalized anxiety disorder with panic attacks, the medical record does not establish disability. (Tr. 18-19.) The ALJ noted that, as early as May 2012, Dr. Lalleman recommended that Plaintiff consult with a psychiatrist regarding these conditions, but she has not sought treatment with a mental help professional since her alleged onset date. (Tr. 19.) Additionally, despite the fact that Dr. Rajput diagnosed Plaintiff with major depressive disorder, generalized, anxiety disorder with panic attacks, and chronic pain, Dr. Rajput found Plaintiff is able to handle her finances, maintain a few friendships, engage in hobbies, drive, and shop for groceries. (Tr. 19-20.) The ALJ gave little weight to Dr. Rajput's assessment of Plaintiff's GAF score, because she found it was not well-supported by Dr. Rajput's own report. (Tr. 20.) The ALJ explained her RFC determination was supported by Dr. Joynson and Dr. Wieliczko's assessments of Plaintiff's mental limitations. (*Id.*) She gave these assessments great weight, finding them to be consistent with the record. (*Id.*)

The ALJ concluded that, considering the record as a whole, including the relative weight of the medical evidence, the record supported her assessment of Plaintiff's RFC. (*Id.*) Based on this RFC and the vocational expert's testimony, the ALJ found that Plaintiff is unable to perform her past relevant work as a warehouse worker (DOT 922.687-058). (*Id.*)

At step five, based on Plaintiff's age, education, work experience, and RFC, as well as the vocational expert's testimony, the ALJ determined Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 21-22). Specifically, the ALJ found Plaintiff could perform the occupations of marker (DOT 209-587.034),

mail clerk (DOT 209.687-026), and cashier II (DOT 211.462-010). (Tr. 22.) The ALJ also determined the vocational expert's testimony was consistent with the information contained in the DOT. (Tr. 22.) Therefore, the ALJ concluded that Plaintiff was not disabled from March 7, 2010 through the date of the ALJ's decision. (Tr. 23.)

### III.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive by a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the reviewing court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his burden of proof and is automatically entitled to benefits. *See* 20 C.F.R. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four that he does not retain the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186

F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

IV.   DECISION

Plaintiff argues the ALJ erred in her decision by (1) failing to properly evaluate the medical evidence, (2) failing to properly evaluate Plaintiff's credibility, and (3) improperly relying on testimony of the vocational expert that was inconsistent with the DOT.

### A.   The ALJ's Evaluation of Plaintiff's of the Medical Evidence

In making a disability determination, the ALJ must consider all evidence before her. *See e.g. Plummer*, 186 F.3d at 433; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986). Although the ALJ may weigh the credibility of the evidence, she must give some indication of the evidence which she rejects and her reasons for discounting such evidence. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). In *Burnett*, the Third Circuit held that the ALJ had not properly decided an evidentiary issue because he "fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Consequently, an ALJ's failure to note if evidence that contradicts her findings was considered, or to explain why such information was not credited, are grounds for a remand. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 435 (3d Cir. 1999). However, this rule does not require an ALJ to explicitly discuss every piece of relevant evidence in her decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). For

example, an ALJ may be entitled to overlook evidence that is neither pertinent, relevant, nor particularly probative. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008); *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

Additionally, when the record presents inconsistencies with a physician's ultimate opinion or where the physician's notes actually undermine his own opinion, an ALJ may appropriately discount the physician's opinion. *See Burke v. Comm'r of Social Security*, 317 F. App'x 240, 243-44 (3d Cir. 2009). Although the ALJ must not "reject evidence for no reason or for the wrong reason, [he] may choose whom to credit when considering conflicting evidence." *Kerdman v. Comm'r of Soc. Sec.*, 607 F. App'x 141, 144 (3d Cir. 2015) (quotations omitted). A reviewing court "may not re-weigh the evidence." *Id.* Thus, even if there is contrary evidence in the record that would justify the opposite conclusion, the ALJ's decision will be upheld if it is supported by substantial evidence. *See Simmonds*, 807 F.2d at 58.

Plaintiff argues the ALJ improperly disregarded evidence in the record showing her asthma is a severe impairment. The Commissioner asserts the ALJ properly assessed all pertinent evidence in concluding that Plaintiff's asthma was not a severe impairment. For the reasons set forth below, the Court finds the ALJ, in determining Plaintiff's RFC, failed to consider and explain her reasons for discounting all of the pertinent evidence related to the severity of Plaintiff's asthma.

In her decision, the ALJ found that Plaintiff's alleged asthma and pulmonary impairment was non-severe, meaning it does not cause more than minimal limitation on her ability to perform work-related activities, because (1) "there [is] no evidence of treatment for asthma," (2) "[c]onsultative examiner Dr. Merlin noted that pulmonary function testing revealed moderate obstructive airways," and (3) "[r]ecords show that Plaintiff smokes cigarettes." (Tr. 13.) Additionally, elsewhere in her opinion, the ALJ assigned little weight to the opinions of state

agency consultants, Dr. Paolino and Dr. Shastry, insofar as they asserted Plaintiff is limited to moderate exposure to pulmonary irritants, because "the record shows that the claimant is a cigarette smoker . . . [and] [t]here is no evidence of asthma exacerbation or treatment since the alleged onset date." (Tr. 20.)

These findings are problematic for several reasons. First, contrary to the ALJ's assertions, there is significant evidence in the record of asthma exacerbation and treatment since the alleged onset date. Specifically, Plaintiff reported to Dr. Merlin that she had experienced an asthma attack in July 2012, which was caused by exertion, lasted approximately 15 minutes, and was relieved by the administration of ProAir. (Tr. 327.) Additionally, between 2011 and 2014, Dr. Lalleman, Dr. Rajput, and Dr. Valcarcel prescribed several medications to Plaintiff, including Ventolin, Advair, albuterol, and Dulera, to treat her asthma and/or other pulmonary conditions. (Tr. 302, 339, 370-75.) Moreover, after the alleged onset date, both Ms. Yesvetz and Dr. Valcarcel explicitly diagnosed Plaintiff with asthma. (Tr. 341, 370-75.) Finally, Dr. Paolino and Dr. Shastry both determined, based on the available record, that Plaintiff's asthma is a severe impairment. (Tr. 65-66, 74-75.) Therefore, the ALJ's findings that "there [is] no evidence of treatment for asthma" and "[t]here is no evidence of asthma exacerbation or treatment since the alleged onset date," are directly contradicted by the record and not supported by substantial evidence.

Second, Dr. Merlin's pulmonary function testing of Plaintiff revealed moderate obstructive airways. (Tr. 329.) Based on these test results and his examination of Plaintiff, Dr. Merlin diagnosed Plaintiff with asthma. (*Id.*) Such evidence weighs in favor of finding that Plaintiff's asthma creates more than a minimal limitation on her ability to work. As such, it is unclear to the Court why the ALJ listed Dr. Merlin's findings as one of the grounds for her conclusion that Plaintiff's asthma is a non-severe impairment. Insofar as the ALJ discounted this portion of Dr.

Merlin's report, she has not provided any basis to do so. Consequently, although the ALJ claims to have considered Dr. Merlin's findings in assessing the severity of Plaintiff's asthma, she has not sufficiently explained her reasons for discounting his opinion.

Third, although the ALJ was correct in observing that Plaintiff's habit of smoking cigarettes directly contradicts Dr. Paolino and Dr. Shastry's determination that Plaintiff is limited to moderate exposure to pulmonary irritants, *see Ingle v. Comm'r of SSA*, Civ. No. 07-590 (JAG), 2008 U.S. Dist. LEXIS 37477, at *41 (D.N.J. May 6, 2008) (finding ALJ properly discarded plaintiff's testimony that he "cannot tolerate fumes in the air," where plaintiff smoked a half pack to a full pack of cigarettes a day), this has no bearing on whether exertion-induced asthma attacks affect Plaintiff's ability to perform work-related activities. Indeed, nowhere in her opinion does the ALJ address Plaintiff's exertional limitations vis-à-vis her pulmonary impairments. Rather, the ALJ solely addresses the effect of Plaintiff's asthma on her environmental limitations. As such, it appears when determining Plaintiff's RFC, the ALJ failed to consider Dr. Merlin's report that Plaintiff had recently experienced a 15-minute exertion-induced asthma attack.

Nonetheless, the Commissioner argues, even if the ALJ erred in evaluating the severity of Plaintiff's asthma, Plaintiff has not demonstrated that this error caused her harm. Under the harmless error rule, a remand is not appropriate if an ALJ's error does not affect the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Here, the ALJ's error is not harmless, because, had the ALJ considered the effects of Plaintiff's asthma on Plaintiff's exertional limitations as well as fully examined the evidence of Plaintiff's environmental limitations, she may have assigned Plaintiff a

more limited RFC.[3] If the ALJ found, for example, that Plaintiff is limited to sedentary work, as defined in 20 CFR 404.1567(a), rather than light work, as defined in 20 CFR 404.1567(a), Plaintiff would not meet the requirements to perform the jobs of marker, mail clerk, or cashier II. These jobs all require a light exertional level, according to both the DOT and the testimony of the vocational expert. (Tr. 52-53); DOT 209-587.034, 209.687-026, 211.462-010. Accordingly, this case is remanded, and the ALJ is directed "to consider and explain [her] reasons for discounting all of the pertinent evidence before [her] in making [her] residual functional capacity determination."[4] *See Burnett*, 220 F.3d at 121.

---

[3] The Commissioner argues the ALJ's error in this case was harmless, because "as long as a claim is not denied at step two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairment to be severe." (Def.'s Br. Pursuant to L.Civ.R. 9.1 (ECF No 11) at 8.) The Court agrees the Commissioner's error at step two in this case was harmless, because the ALJ ultimately found in Plaintiff's favor by determining that Plaintiff had other severe impairments, *i.e.*, disorders of the lumbar and cervical spine, major depression, and generalized anxiety disorder with panic attacks. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n2 (3d Cir. 2007) ("Because the ALJ found in [plaintiff's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing *Rutherford*, 399 F.3d at 553). However, this argument is immaterial to this Opinion, because the Court finds the ALJ's error caused harm at steps four and five by impacting the ALJ's assessment of Plaintiff's RFC and, consequently, the ALJ's ultimate conclusion that Plaintiff is able to perform work that exists in significant numbers in the national economy.

[4] Additionally, although this particular issue was not raised by Plaintiff on appeal, the Court notes the ALJ cited an invalid basis for disregarding the report of Ms. Yesvetz. Specifically, the ALJ assigned little weight to Ms. Yesvetz's opinion regarding Plaintiff's work-related limitations, in part, because "physician's assistants are not acceptable medical sources." (Tr. 21.)

Pursuant to the rules promulgated under the Act, "acceptable medical sources" are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Opinions and assessments from "other medical sources," such as physician's assistants, may be used to provide additional evidence about the symptoms, diagnoses, and prognoses of any impairments identified by acceptable medical sources. 20 C.F.R. § 404.1513(d). However, other medical sources may not be used to establish the existence of an impairment in the first instance. Social Security Ruling 06-03p, 2006 SSR LEXIS 5 at *4; *see also Dougherty v. Astrue*, 381 F. App'x 154, 156 (3d Cir. 2010). Within these parameters, the opinions of other medical sources must be weighed using the same factors as medical opinions, *i.e.*, how long the source has known and how frequently she has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well she explains her opinion; whether she

**B.  The ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff argues the ALJ erred in assessing Plaintiff's credibility, because she failed to give appropriate consideration to the record as a whole and she failed to make specific findings regarding Plaintiff's credibility. In opposition, the Commissioner contends the Court should defer to the ALJ's credibility determination, because she "provided a full and detailed credibility analysis and properly considered Plaintiff's inconsistent statements, her longitudinal treatment history, the type of treatment she received, and the statements of the acceptable medical sources." (ECF No. 11 at 10.)

It is the ALJ's responsibility "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Thus, "[i]n addition to objective medical facts and expert medical opinions, the [ALJ] must consider the claimant's subjective evidence of pain and disability, as corroborated by family and neighbors; and all of these factors must be viewed against the applicant's age, educational background and work experience." *Reefer v. Barnhart*, 326 F.3d 376, 381 (3d Cir. 2003) (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)). A claimant's "allegations of subjective symptoms must be supported by objective medical evidence." *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (citing 20 C.F.R. § 404.1529(b)). As such, "the ALJ may reject [subjective complaints of pain] when they are inconsistent with

---

has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. Social Security Ruling 06-03p, 2006 SSR LEXIS 5 at *10-*13; s*ee also Mussi v. Astrue*, 744 F. Supp. 2d 390, 408-09 (W.D. Pa. 2010); *Barnhart v. Colvin*, Civ. No. 1:14-CV-00767, 2015 U.S. Dist. LEXIS 21670, at *24 (M.D. Pa. Feb. 24, 2015).

Therefore, the mere fact that Ms. Yesvetz is an other medical source, rather than an acceptable medical source, is not a legitimate basis to assign little weight to her opinion regarding the severity of Plaintiff's impairments. On remand, the ALJ is directed to weigh Ms. Yesvetz's opinion pursuant to the factors set forth in Social Security Ruling 06-03p.

objective medical evidence in the record." *Morel v. Colvin*, Civ. No. 14-2934 (ES), 2016 U.S. Dist. LEXIS 44347, at *11 (D.N.J. Apr. 1, 2016) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).

Courts will "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor." *Reefer*, 326 F.3d at 380. In that regard, "[t]he substantial evidence standard entitles an ALJ to considerable deference, especially in credibility findings." *Volage v. Astrue*, Civ. No. 11-4413, 2012 U.S. Dist. LEXIS 146683, 2012 WL 4742373, at *7 (D.N.J. Oct. 1, 2012) (citing *Smith v. Califano*, 637 F.2d 968, 969 (3d Cir. 1981). Nonetheless, "[w]hen making credibility findings, the ALJ must indicate which evidence he rejects and which he relies upon as the basis for the findings." *Bailey*, 354 F. App'x at 618 (quoting *Schaudeck*, 181 F.3d at 433).

In this case, the Court has already determined remand is necessary, because the ALJ failed to consider and explain her reasons for discounting all of the pertinent evidence regarding Plaintiff's alleged pulmonary impairments. Because assessing a claimant's credibility requires a holistic review of the entire record, full consideration of the evidence of Plaintiff's pulmonary impairments may affect the ALJ's credibility determination on remand. As such, the Court makes no finding in this Opinion as to whether the ALJ properly addressed Plaintiff's credibility in her August 29, 2014 decision, and simply directs the ALJ to, on remand, conform her credibility determinations to the requirements of Social Security Ruling 96-7p and the regulations at 20 C.F.R. § 404.1529.

### C. The ALJ's Reliance on the Vocational Expert's Testimony

Finally, Plaintiff argues the ALJ improperly relied on portions of the vocational expert's testimony that were based on her own professional experience and observations, rather than the

DOT. Although Plaintiff does not specify which portion of the vocational expert's testimony she believes "is inconsistent to that of the [DOT]," (Pl.'s Mem. of Law (ECF No. 9) at 26), the Court presumes Plaintiff takes issue with those portions of the expert's testimony which the expert herself admitted were inconsistent with the DOT. (Tr. 53-54.) Namely, her testimony related to the acceptable percent of time that an individual with the hypothetical RFC could be off task, as a marker, mail clerk, or cashier II, as well as the sit/stand option at these jobs. (*Id.*)

"Social Security Ruling 00-4p requires that the ALJ ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and that, if the testimony does appear to conflict with the DOT, to 'elicit a reasonable explanation for the apparent conflict.'" *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002) (quoting SSR 00-4p, 2000 SSR LEXIS 8). This Ruling requires both that the vocational expert's explanation of the conflict be made on the record and that the ALJ address in his decision how the conflict was resolved. *Id*. An ALJ's failure to explain a conflict between a vocational expert's testimony and the DOT can form the basis for a remand, provided the record does not otherwise contain substantial evidence that the plaintiff can perform her past work or other jobs that exist in the economy. *See Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2003) (remanding case where ALJ failed to address conflict between vocational expert evidence and the DOT and record did not contain evidence, other than the vocational expert's testimony, that the plaintiff could perform a significant number of jobs that exist in the economy); *see also Rutherford*, 399 F.3d at 557.

Because the DOT is not a comprehensive source of information, Social Security Ruling 00-4p allows vocational experts to provide "[i]nformation about a particular job's requirements or about occupations not listed in the DOT . . . obtained directly from . . . a [vocational expert's] experience in job placement or career counseling." Social Security Ruling 00-4p, 2000 SSR LEXIS

8 at *6. In short, a vocational expert "may be able to testify to more specific requirements and information about jobs or occupations than the DOT." *Green v. Astrue*, Civ. No. 10-468, 2010 U.S. Dist. LEXIS 125864, at *13 (W.D. Pa. Nov. 30, 2010). Here, the vocational expert's testimony regarding the permissible amount of time off-task and the sit/stand options available with particular jobs is not available in the DOT. *See* DOT 209-587.034, 209.687-026, 211.462-010. Instead, the vocational expert's testimony on these issues was properly supported by the expert's own professional experience. (Tr. 53-54.) As such, pursuant to Social Security Ruling 00-4p, the ALJ did not err in relying on this portion of the vocational expert's testimony.

## V.   CONCLUSION

For the reasons set forth above, this case is **REMANDED** for further administrative proceedings consistent with this Opinion. An appropriate Order will follow.

Date: January 25, 2017                              */s/ Brian R. Martinotti*_____
                                                    HON. BRIAN R. MARTINOTTI
                                                    UNITED STATES DISTRICT JUDGE